COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-210-CV
 
 
  
IN 
THE INTEREST OF E.V.
AND 
I.S.V., JR., CHILDREN 
 
 
  
------------
 
FROM 
THE 393RD DISTRICT COURT OF DENTON COUNTY
 
------------
 
MEMORANDUM OPINION [1]
 
------------
        Appellant 
Sarah G. appeals from the trial court’s termination of her parental rights to 
her children, E.V. and I.S.V., Jr. In six points, she challenges the legal and 
factual sufficiency of the evidence to support the trial court’s findings on 
endangerment and failure to support. Because we hold that the evidence is 
legally and factually sufficient to support the termination of Sarah’s 
parental rights, we affirm the trial court’s order of termination and 
adoption.        In 
November 1999, Sarah apparently voluntarily placed the children with her mother, 
Lynn H., who was and is married to Jim C. In December, Lynn filed a petition to 
modify the parent-child relationship, seeking conservatorship of the children. 
On November 1, 2000, Lynn and Jim filed a petition for termination and adoption 
of the children. On November 28, 2000, Lynn was named sole managing conservator 
of the children, and the trial court ordered that the parents have no visitation 
rights with the children. The causes were later consolidated. The trial court 
terminated Sarah’s parental rights on April 2, 2004 after a four-day bench 
trial. The father voluntarily relinquished his rights. The trial court signed 
the order of adoption and termination on June 2, 2004.
        The 
petition for termination alleged, and the trial court found, that Sarah 
knowingly placed or knowingly allowed the children to remain in conditions or 
surroundings that endangered their physical or emotional well-being, engaged in 
conduct or knowingly placed the children with persons who engaged in conduct 
that endangered their physical or emotional well-being, and failed to support 
the children in accordance with her ability during a period of one year ending 
within six months of the filing of the petition for termination. [2] 
The trial court also found that termination was in the children’s best 
interest. [3]
        In 
six issues that she briefed together, Sarah argues that the evidence is legally 
and factually insufficient to support the trial court’s findings on 
endangerment and failure to support.
        As 
this court explained in In re W.J.H.,
Endangerment 
means to expose to loss or injury, to jeopardize. It can occur through both acts 
and omissions. Neglect can be just as dangerous to the child’s emotional and 
physical health as intentional abuse.
Under 
subsection D [of the termination statute], evidence must show that the child’s 
environment is a source of endangerment. In some circumstances, the parent’s 
conduct may create that dangerous environment. Subsection E focuses on the 
parent’s conduct alone, including acts and omissions. While the endangerment 
must be a direct result of the parent’s course of conduct, the conduct does 
not have to be directed toward the child, nor does the child have to suffer 
actual injury for the finding to be upheld. Similarly, the conduct does not have 
to cause a concrete threat of injury to the child. If the evidence shows that 
the parent has engaged in a course of conduct which has the effect of 
endangering the child, then the finding under subsection E may be upheld. [4]

Similarly, 
this court has also explained,
As 
a general rule, conduct that subjects a child to a life of uncertainty and 
instability endangers the physical and emotional well-being of a child. Drug use 
and its effect on a parent's life and his ability to parent may establish an 
endangering course of conduct. Further, a parent's mental state may be 
considered in determining whether a child is endangered if that mental state 
allows the parent to engage in conduct that jeopardizes the physical or 
emotional well-being of the child. Threats or attempts to commit suicide may 
also contribute to a finding that the parent engaged in a course of conduct that 
is detrimental to a child's physical or emotional well-being. [5]
        The 
trial court admitted the following evidence. On Sunday, October 31, 1999, 
Sarah’s grandmother called Jim and voiced concerns about Sarah. He went to 
Sarah’s apartment to check on her. He found the door wide open. Sarah was 
incoherent. I.S.V., Jr., who was one year old at the time, was asleep in his 
crib, and his older sister E.V., who was two and one-half years old, was 
watching television. Jim saw bottles of pills lying on the breakfast bar, and he 
testified that the pills were within reach of the children. Several days later, 
Sarah attempted to commit suicide. Within two days, she tried again. Although 
the children were still in her legal custody at the time of both attempts, there 
is no evidence that they were physically present when Sarah tried to kill 
herself. Sarah testified that she told doctors that she had tried to kill 
herself because she was “in an abusive relationship with [her] children’s 
father, and either he was going to kill [her] or [she] was going to kill 
[herself].”
        Jim 
testified that Sarah had told him that the children’s father was a drug 
dealer. Jim also testified that Sarah had told him that the father had assaulted 
her in the parking lot of her apartment complex while she was holding the baby, 
I.S.V., Jr. Another witness testisfied that the father had beaten Sarah pretty 
badly at a motel. Sarah testified that the children’s father had assaulted her 
numerous times, both before and after the children were born, and that she went 
to the hospital as a result of several of the assaults. He had gone to jail or 
prison for four of the assaults.
        Sarah 
testified that she had lived in Kansas for about a year prior to trial. She was 
not employed at the time of trial. She had had sporadic employment, with her 
most recent employment, from December 2003 until January 2004, netting her $420. 
She planned to begin a certified nurse aide course in Kansas after trial. 
Although the trial court had ordered that Sarah pay child support of $177 per 
month, she did not pay any in 2004 and only $25 in 2003, and that was in August. 
Sarah testified that she had not paid for any of the children’s medical 
expenses since 1999. On the other hand, she paid the expert witness $700, 
according to her testimony, and $1,075, according to his. Sarah sent the 
children cards and some clothes during the years that she was not allowed to 
visit.
        Sarah’s 
paternal grandmother helped support her. Sarah testified that since 1999, her 
grandmother had provided her with a car to drive, a place to live, and a big 
screen television, but her grandmother would not give her money to support the 
children.
        By 
the time of trial, Sarah testified, she had been arrested four times, three 
times for theft and once for possession of drugs. She also admitted to having a 
pending theft charge in Baxter Springs, Kansas, but she denied that she had been 
arrested there. In March 2001, Sarah pled guilty to the possession of a 
controlled substance by fraud and received two years’ probation. In 2002, she 
acted as a drug informant to attempt to get off probation early so that she 
could move to Kansas.
        Sarah 
testified that she was a recovering addict, that she was addicted to 
painkillers, hydrocodone, and Xanax, and that Xanax, which had been prescribed 
for her, had been her drug of choice when she first became addicted. She also 
testified that she had lied to Denton County MHMR personnel after her second 
suicide attempt when she told them that she did not have a drug problem.
        Sarah 
said that her recovery began in March 2001 when she began her probation, but she 
admitted that she continued to associate with people whom she had done drugs 
with even after that time. She also claimed that she was in treatment for her 
drug problem at Tulsa Rightway, 120 miles from her home in Kansas, and that she 
had been going there for about a year. She testified that she saw a counselor, 
Rebecca Hall, once a week and attended group counseling. She also testified that 
she paid $130 per month for that treatment. Sarah did not know what Hall’s 
credentials were. Sarah did not provide documents regarding her treatment for 
substance abuse in Oklahoma or her prior drug treatment at clinics in Denton and 
St. Louis. Sarah claimed that she was in a twelve-step program and had been 
during her entire recovery, but she could not name any of the steps and could 
not explain which step she was working on. At one point, her therapist was 
listed as a witness, but Sarah chose not to call her. Sarah also chose not to 
call her grandmother as a witness.
        Sarah's 
urine and hair follicle drug tests that the trial court ordered during the trial 
came back negative for drugs, but they also came back negative for methadone, 
which Sarah insisted that she took daily as prescribed as part of her drug 
treatment. She had no explanation for the negative test for methadone.
        When 
the children began living with Jim and Lynn in November 1999, E.V. had night 
terrors every night for about a year and frequent bedwetting. She was also 
terrified of strangers, the dogs that she had previously enjoyed playing with, 
and visits from the Tooth Fairy or Santa Claus. Sarah had made threatening 
telephone calls to Lynn and Jim throughout their more than four years of raising 
her children, sometimes twenty to thirty calls in one hour; at one point, the 
family stayed outside the home overnight because they feared for their safety. 
Before Sarah’s visitation was discontinued in 2000, the children would be 
frightened and clingy after the visits with her.
        By 
the time of trial, E.V.’s night terrors were occurring only about once a 
month. The children were doing pretty well in school and at home. Lynn and Jim 
interacted with them appropriately and wanted to adopt them. The couple showed a 
respect for the children's biracial heritage. Lynn and Jim also demonstrated a 
willingness to reestablish some contact between Sarah and the children in the 
future, but only if she first gains stability.
        Based 
on the evidence before us and the applicable standards of review, we conclude 
that the evidence is legally [6] and factually [7] 
sufficient to support the trial court’s findings that Sarah knowingly placed 
or knowingly allowed the children to remain in conditions or surroundings that 
endangered their physical or emotional well-being and that Sarah engaged in 
conduct or knowingly placed the children with persons who engaged in conduct 
that endangered their physical or emotional well-being. We overrule Sarah’s 
first, second, fifth, and sixth points. Even though Sarah does not challenge the 
evidence supporting the trial court’s best interest finding, we also note that 
the evidence supports that finding. [8] We therefore hold that the 
evidence is legally and factually sufficient to support the trial court’s 
order terminating Sarah’s parental rights. Because of our disposition of 
Sarah’s first, second, fifth, and sixth points, we do not reach her third and 
fourth points regarding the evidence supporting her failure to support the 
children. [9]
        Having 
held that the evidence is legally and factually sufficient to support 
termination, we affirm the trial court’s order of termination and adoption.
 
 
                                                                           PER 
CURIAM
PANEL 
F:   DAUPHINOT, HOLMAN, and GARDNER, JJ.
DELIVERED: 
August 25, 2004


NOTES
1. 
See Tex. R. App. P. 47.4.
2. 
See Tex. Fam. Code Ann. § 
161.001(1)(D), (E), (F) (Vernon 2002).
3. 
See id. § 161.001(2).
4. 
In re W.J.H., 111 S.W.3d 707, 715-16 (Tex. App.—Fort Worth 2003, pet. 
denied) (citations omitted).
5. 
In re R.W., 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. 
denied) (citations omitted).
6. 
See In re J.F.C., 96 S.W.3d 256, 265-66 (Tex. 2002).
7. 
See In re C.H., 89 S.W.3d 17, 25, 28 (Tex. 2002).
8. 
See J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25, 27, 28; 
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).
9. 
See Tex. R. App. P. 47.1; W.J.H., 
111 S.W.3d at 715.